UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

KEVIN J. KEMP,                            )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )          No.  2:12CV0071 SNLJ
                                          )                        (TIA)
CAROLYN W. COLVIN,[1]                     )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )
          Defendant.                      )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

     This matter is before the Court on an adverse ruling of the Social Security Administration.

The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).  The suit involves Applications for Disability Insurance Benefits under Title II of the Social

Security Act and for Supplemental Security Income under Title XVI.  Claimant has filed a Brief in

Support of his Complaint; and the Commissioner has filed a Brief in Support of her Answer.

Plaintiff filed a Reply thereto.

## I.     Procedural History

     On April 10, 2006, Claimant Kevin J. Kemp initially filed Applications for Disability Insurance

Benefits under Title II of the Act, 42 U.S.C. §§ 401, et. seq.  and Supplemental Security

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
therefore substituted for Michael J. Astrue as the Defendant in this action.

Income (Tr. 125-36),[2] alleging a disability onset date of April 5, 2005[3], due to degenerative disc disease. The applications were denied, and Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 51-52, 75-79, 80-81, 534). Claimant testified and was represented by counsel. (Tr. 1-23). Vocational Expert Gary Weimholt also testified at the hearing. (Tr. 18-22, 102-03). After a May 29, 2008 hearing, the ALJ issued a Decision on June 25, 2008, finding that Claimant was not disabled. (Tr. 1-23, 56-71). On April 28, 2010, the Appeals Council denied Claimant's Request for Review after considering additional medical evidence, a report from an educational consultant, and a letter from counsel. (Tr. 46-49, 202-03, 289-90, 340-42, 344-45, 346-49, 446-49). After considering Defendant's Motion to Remand, the Honorable Stephen N. Limbaugh, Jr. remanded the case to the ALJ for further proceedings consistent with the Order of November 17, 2010. (Cause No. 4:10cv1142SNLJ, ECF No. 14) (Tr. 450-59).

Based on the district court's remand order, the Appeals Council directed the ALJ to give further consideration to whether alcoholism was a contributing factor material to the disability determination and issue a new opinion. (Tr. 350, 400, 443-45). While the case was pending on appeal, Claimant refiled applications for a period of disability, disability insurance benefits, and supplemental security income on November 8, 2010. (Tr. 400, 445, 462). The Appeals Council's action with respect to the current claim renders the subsequent claims duplicate, and so ordered the ALJ to associate the claim file and issue a new decision on the associated claims. (Tr. 445). Claimant requested a supplemental hearing before an ALJ. Vocational Expert Stephen Dolan, a certified

[2]Tr." refers to the page of the administrative record filed by the Defendant with his Answer (Docket No. 10/filed December 4, 2012).

[3]Although Claimant originally alleged an onset date of May 10, 2003 in his applications, he amended his onset date to April 5, 2005 at the supplemental hearing and in the Statement of Claimant or Other Person. (Tr. 423, 534-35, 562).

rehabilitation counselor, also testified after the hearing. After the supplemental hearing on April 4, 2011, the ALJ issued a Decision on October 26, 2011, finding that Claimant was not disabled. (Tr. 397-407, 415-42). On July 26, 2012, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's Request for Review after considering the interrogatory responses of Jeff Rayl, Dr. Russell's sworn statement, Claimant's statement, and a letter from counsel (Tr. 350-53, 354-64, 366-69, 371-89, 391-93, 622-36, 637-57). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g). On September 19, 2012, Claimant filed his Complaint in this Court.

## II.  Evidence Before the ALJ

### A.  Hearing on May 29, 2008

#### 1.  Claimant's Testimony

At the hearing on May 29, 2008, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 1-23). Claimant's date of birth is December 28, 1964 and at the time of the hearing, Claimant was forty-three. (Tr. 4). Claimant lives with his wife and two children, ages thirteen and four. (Tr. 5). His wife works as a critical care nurse at a Audrain Medical Center in Mexico, Missouri. Claimant completed tenth grade. He is right-handed. Claimant stands at five feet six inches and weighs approximately 210 pounds. (Tr. 5).

Claimant served 120-day term in an alcohol treatment center in Farmington, Missouri in 1994 after threatening his ex-wife with a knife. (Tr. 6). He also served 180 days in the county jail for non-support in 2003. (Tr. 7). Claimant testified that at the time of the hearing, he was no longer covered by Medicaid because his wife earns too much money. (Tr. 8). Claimant smokes one and a half

packages of cigarettes each day and consumes three cases of beer each week. (Tr. 11). He is serving a five-year term of probation for non-support and has served one year. (Tr. 17).

Claimant last worked in May, 2003 at Missouri Mounting, a factory producing standing posters of sports figures. (Tr. 9). He stopped working after being placed on light duty after returning from an injury. Claimant testified that he was fired due to absences. His injury occurred while he was picking up heavy pallets. (Tr. 9). Claimant received $3,200 as settlement of his Workers Compensation case and used the money to pay back child support. (Tr. 10, 16). Although he had a drivers license, the license has been taken due to failure to pay child support. (Tr. 10). Claimant testified that he cannot work as a cashier in a gas station/convenience store, because such job requires standing and bending a lot. (Tr. 11).

Claimant testified that a pinched nerve lumbar impairment prevents him from working. (Tr. 12). He explained he has not had surgery, because Dr. Lange would not perform surgery, and he had physical therapy once. (Tr. 12). Claimant testified that his back pain interferes with his ability to concentrate. (Tr. 15).

Claimant stood up and indicated that he had to stand due to back pain. (Tr. 12). He testified that his pain goes down his leg into his toes and rated the pain as a ten, a strong pain sometimes unbearable. Claimant explained how standing or sitting for long periods of time causes the pain to increase. (Tr. 12). Claimant indicated that he could stand or sit for twenty minutes. (Tr. 13). To relieve the pain, he takes muscle relaxers and pain pills. (Tr. 13). Claimant went to the emergency room on April 30 because of his intolerable back pain and received prescription medications. (Tr. 14, 16). Claimant also takes Percocet as needed and applies Icy Hot and a heating pad and takes

warm showers to help with the pain. Claimant also lies down for thirty minutes on his left side. (Tr. 14). Injections have helped alleviate his back pain for a minute. (Tr. 15).

## 2. Testimony of Vocational Expert

Vocational Expert Gary Weimholt testified in response to the ALJ's questions. (Tr. 18-22). Mr. Weimholt testified that Claimant's past relevant work included working as a warehouse worker in a manufacturing paper board plant or poster board plant, a medium job, unskilled; a cook at a military school and a home for the disabled, a medium job, skilled in the trade of cooking; and a maintenance man, a municipal worker, medium job and semi-skilled. (Tr.18).

The ALJ asked Mr. Weimholt to assume four RFCs, the first being as follows:

> occasionally lift and carry 20 pounds, frequently lift and carry 10. Could sit, stand or walk about six hours each over an eight hour day. No more than occasional lifting from the floor, stooping or squatting. And lastly limited to simple work activity. Okay. That's RFC number one. RFC number two is going to be those factors plus needs a sit/stand option at will. RFC number three, occasionally lift and carry 20 pounds, frequently lift and carry 10. Can sit for about six out of eight hours. Stand, walk about two out of eight hours with customary breaks. Less than occasional lifting from the floor, stooping and squatting. Needs a sit/stand option at will and limited to simple work activity. Okay. Number four, sit/stand and walk for less than eight hours combined. No lifting and carrying over 10 pounds, limited to simple work activity, and less than occasional squatting, stooping and lifting from the floor. ... Mr. Weimholt, would any of the past work be available with any of these four RFCs?

(Tr. 18-19). Mr. Weimholt responded no. The ALJ asked why a hypothetical individual with RFC number four with the age, education and work experience of claimant would not be able to perform work. Mr. Weimholt explained an individual with such limitations would be incompatible with regular performance of work and up to eight hours of more in some cases. Next, the ALJ asked Mr. Weimholt assuming hypothetical number three, what other work would be available to such individual. Mr. Weimholt explained such individual could perform jobs considered to be in the

sedentary level, because of the limitation of sitting or standing and walking for more than two hours a day. (Tr. 19). Such jobs include pharmaceutical packaging jobs where workers are seated and have the opportunity to sit/stand at will while packaging with 1,200 jobs in the state economy and fifty times that number nationally; micro filming/document preparation jobs, simple one two step jobs with 500 jobs in the state economy and at least fifty times that number available nationally; small parts assembler jobs with approximately 2,500 in the state economy and fifty times that number available nationally. (Tr. 19-20).

The ALJ asked Mr. Weimholt to consider hypothetical number two with the sit/stand option at will. (Tr. 20). Mr. Weimholt opined some jobs would be available including simple one or two step unskilled cashiering jobs with 1,500 in the state economy and fifty times that number available nationally; some inspection and hand packager jobs with 1,500 available in the state and fifty times that number nationally; and some bench assembly jobs, with 2,500 available in the state and fifty times that number available nationally. (Tr. 20-21).

Finally, the ALJ asked Mr. Weimholt to consider hypothetical number one and what other work would be available to a hypothetical individual with the age, education and work experience of the claimant with the limitations. (Tr. 21). Mr. Weimholt opined more jobs would be available inasmuch as the sitting and standing are not limited and cited one or two step type cashiering jobs, unskilled, with 10,000 available in the state; inspection jobs with at least 7,500 available; and hand assembly jobs with approximately 10,000 available in the state economy and fifty times that number available nationally. (Tr. 21).

In response to counsel's question, Mr. Weimholt explained that the total work force in the state to be two and a half million jobs with approximately ten percent of the jobs being sedentary and

a third of those the unskilled sedentary ones.  (Tr. 21).  Mr. Weimholt testified that none of the jobs would allow an individual to lie down during the work day.  (Tr. 22).

### B.  Hearing on April 4, 2011

#### 1.  Claimant's Testimony

At the hearing on April 4, 2011, Claimant testified in response to questions posed by the ALJ and counsel.  (Tr. 415-42).  Claimant testified that he has had Medicaid for the last two months.  (Tr. 430).

Claimant last worked at Missouri Mounting as a material handler in 2003.  (Tr. 430).

Claimant testified that his left side of his back down his legs into his foot bothers him.  (Tr. 437).  Walking up and down steps, bending, lifting, and sitting a long time makes his pain worse.  (Tr. 437-38).  Claimant takes Advil and Gabapentin for his pain.  (Tr. 438).  Claimant testified that the Advil and the Neurontin do not help at all.  (Tr. 441).

Claimant vacuums, helps his daughter and the laundry, and barbeques a little bit.  (Tr. 439).  Claimant has to stop after walking one block because of his pain.  Claimant testified that he can stand for ten minutes before he experiences pain.  Claimant can carry a gallon of milk on his right side with his right hand.  (Tr. 439).  Claimant testified that he can sit with both feet on the floor for ten minutes.  (Tr. 440).

Claimant wakes up at 6:45 to get his daughter ready for school.  (Tr. 440).  During the day, Claimant has to lie down on a heating pad for thirty minutes.  (Tr. 441).

#### 2.  Open Record

At the outset of the hearing and at the request of counsel, the ALJ stated that the record would be held open for sixty days so that he could obtain additional evidence and receive comment

from Dr. Russell regarding the investigation report.  (Tr. 421-23, 371-89).  A review of the record shows that counsel timely submitted such evidence, a statement from Dr. Russell in regard to the evidence from OIG, to the ALJ before he issued a decision denying Claimant's claims for benefits. (Tr. 571-72, 622-71).

On June 17, 2011, the ALJ forwarded to counsel interrogatories he intended to send to vocational expert, J. Stephen Dolan.  (Tr. 573-74).  In response, counsel requested the ALJ to include four additional questions.  (Tr. 577-79).  A review of the interrogatories propounded on Mr. Dolan shows that the ALJ include two of counsel's proposed interrogatories.  (Tr. 576-79, 580-86).[4]  After the ALJ received Mr. Dolan's responses to the interrogatories, he forwarded the responses to counsel on August 10, 2011.  (Tr. 588-91).  In the August 22, 2011 letter, counsel responded to the interrogatories and responses from Mr. Dolan and argued that Claimant would be unable to perform any jobs cited by Mr. Dolan inasmuch as the sit/stand option every thirty minutes would not be consistent with the medical evidence.  (Tr. 593-95).

### 3.  Forms Completed by Claimant

In the Function Work - Adult dated April 20, 2006, Claimant noted his daily activities to include fixing his daughter's breakfast, dressing, watching television, going outside when his daughter plays, and fixing lunch.  (Tr. 161).  Claimant takes his son to school and picks him up from school. (Tr. 161).  Claimant takes care of his children while his wife is sleeping.  (Tr. 162).  He can do one or two loads of laundry once or twice a week and fix simple meals.  (Tr. 163).  Claimant goes shopping one to two times a week for household supplies.  (Tr. 164).

---

[4]The ALJ declined to include the following questions: "3.  Assume further that the individual would need to lie down two to three times per day for rest due to pain and 4.  Could the individual perform unskilled occupation?"  (Tr. 579).

An unsigned, undated Physical Residual Functional Capacity Assessment ("PRFCA") form is included in the record. (Tr. 323-29). The PRFCA form states that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 324).[5]

## III. Medical Records and Other History

On May 20, 2003, Claimant reported having low back pain after lifting at work. (Tr. 205). The doctor at the Wellsville Medical Clinic prescribed Bextra and Neurontin. In a follow-up visit, Claimant reported imbibing in alcohol and taking several Neurontin. The doctor strongly recommended a psych consult. (Tr. 205).

Claimant started physical therapy on June 3, 2003 for impaired joint mobility, motor function, muscle performance, and reflex integrity associated with spinal disorders. (Tr. 214). Claimant reported injuring his back on May 10, 2003 and attempting to return to work. His job tasks included primarily lifting all day. Claimant reported taking no medications and not having a follow-up appointment with Dr. Kondro scheduled. (Tr. 214). The therapist noted Claimant complained of moderate to severe left lumbar pain, and his signs and symptoms were consistent with lumbar strain. (Tr. 216). On June 6, 2003, Claimant cancelled his remaining appointments due to insurance reasons.

---

[5] The undersigned notes that in his opinion, the ALJ relied on several different pieces of evidence in determining Claimant's RFC. The ALJ considered the medical opinions of Dr. Martinson, Dr. Lange, and examinations performed by other treating sources. The ALJ also considered Claimant's testimony during the hearing, and the statements he made in his function report. Finally, the ALJ looked to notes from his physical therapist's functional capacity evaluation. See Pearsall, 274 F.3d at 1217-18 (noting the ALJ may look to "all relevant evidence," including the "observations of treating physicians and others" when making a RFC determination). In determining Claimant's RFC, there is no evidence the ALJ relied on the unsigned, undated social security form. Compare Dewey v. Astrue, 509 F.3d 447, 448 (8th Cir. 2007). More to the point, Claimant, not the ALJ, bears the burden of establishing his RFC. Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

(Tr. 211-12).

On February 11, 2004, Claimant received treatment in the emergency room after injuring his back by bending over to pick up his daughter. (Tr. 274).

The February 17, 2004 CT of his lumbar spine revealed a suspect impingement upon the left L2 and L4 nerve roots secondary to bulging disks. (Tr. 273, 387).

On March 31, 2004, Claimant reported having back pain for a year. (Tr. 268). He noted he reinjured his back lifting a child in February. (Tr. 269). He was not taking any medications even though he had a prescription for Vicodin, but he had not filled the prescription. (Tr. 269). Claimant reported increased back pain during the emergency room visit on December 7, 2004. (Tr. 265). Claimant had been scuffling with his wife. (Tr. 266).

On February 24, 2005, Dr. David Lange, an orthopedic doctor, completed an independent spine evaluation. (Tr. 284). Claimant noted he cannot work due to his symptoms and explained although he returned to light work after the injury, he could not even perform light work because of discomfort, and his employment was terminated. (Tr. 285). He indicated that he has not sought alternative employment at any demand level. Examination appeared to be normal from a reflex point of view and no obvious atrophy. Claimant reported decreased sensation to light touch from left knee down. Dr. Lange noted his reflexes were normal, and he did not have atrophy. Dr. Lange noted no definite weakness on manual testing and observed Claimant to be able to walk on the toes and the heels without obvious weakness. Dr. Lange further observed Claimant to avoid weight bearing on the left leg but also at other times, his gait appeared to be more normal. (Tr. 285). Dr. Lange observed how Claimant "really presented in somewhat of a mixed fashion. He did have some positives from a Waddell's testing point of view." (Tr. 286). Dr. Lange opined that he would

suggest if Claimant "truly believes that his symptoms are troubling, that he follow-up with an orthopedic spine surgeon near his home town (two hours from St. Louis) for consideration of perhaps an MRI. There may well be a lesion that could be treated." (Tr. 287). Dr. Lange concluded that his symptoms as presented would cause difficulty with heavy lifting and repetitive bending, but his symptoms would not prevent him from seeking employment at a lighter demand level although Claimant has not done so over the past two years. (Tr. 287).

On March 31, 2005, Dr. Bradley Buchanan treated Claimant's lumbar radiculopathy on referral by Dr. George Comfort. (Tr. 257). Dr. Buchanan noted that the February 17, 2004 CT showed multiple bulging disks with suspected impingement on the left L2 and L4 nerve roots secondary to bulging disks. Dr. Buchanan administered a lumbar epidural steroid injection. (Tr. 257).

Claimant returned to the emergency room complaining of left-sided lower back pain. (Tr. 258). Dr. George Comfort recommended a steroid injection. (Tr. 261-62).

The MRI showed degenerative disc disease and left lateral protrusion at L4-5 extending into the neural foramen compressing the left nerve root sleeve. (Tr. 283, 388). In the April 5, 2005 letter, Dr. David Lange noted Claimant reported back pain with both flexion and extension and also passive rotation of the torso to the left. (Tr. 281). Dr. Lange reviewed the MRI and opined that Claimant has small disc prominences at both L2-3 and also L4-5 at the exit zone at each level. (Tr. 281). Dr. Lange noted it would be difficult "to enthusiastically suggest surgery with the recent MRI. Basically the discs are not totally normal at L2-3 and L4-5. That having been said, however, his symptoms of posterior leg discomfort really do not particularly agree with pathology at either level. Also given that he has primarily back pain as opposed to radiculopathy, one would not enthusiastically offer

surgery." (Tr. 282).

On April 20, 2005, Claimant reported drinking alcohol and taking a Percocet and then feeling dizzy a couple of hours later to the emergency room doctor at Audrain Medical Center. (Tr. 244).

In the May 19, 2005 treatment note from Audrain Medical Center, Dr. Bruce Pugatch noted how Claimant has been transported to the emergency room after being subdued by law enforcement officers with a bean bag shot after becoming extremely agitated after consuming alcoholic beverages. (Tr. 229). Claimant was admitted for evaluation and treatment and a psychiatry consultation. He voluntarily agreed to admission to East Psychiatry. (Tr. 229). Claimant admitted to consuming approximately twelve cans of beer a day as well as occasional Vodka consumption. (Tr. 230). His past medical history included depression, chronic alcohol usage, low back pain, and previous history of intentional drug overdose and suicidal ideation. Physical examination showed Claimant to be recumbent in hospital bed and appeared to be comfortable and not in acute distress. (Tr. 230). Dr. Pugatch followed detox protocol and found Claimant to have acute alcohol intoxication, agitation, and suicidal ideations. (Tr. 231).

On June 9, 2005, Dr. Bradley Buchanan administered a lumbar epidural steroid injection. (Tr. 227). Dr. Buchanan noted that Claimant has had two prior injections, one at the end of April and the other on May 4 as treatment for his lumbar radiculopathy. After the initial injection, Claimant reported significant improvement in his pain but he relapsed after two to three weeks. (Tr. 243). Dr. Buchanan discussed the need for smoking cessation and back rehab in conjunction with the epidural steroids. (Tr. 243). After the second injection, Claimant reported having no pain relief. (Tr. 227).

The June 30, 2005 Outpatient Psychiatric Evaluation note reflects how Claimant had been admitted to 2 East in the past on one occasion for alcohol intoxication. (Tr. 289). Dr. John Hall noted he was admitted after alleging to stab himself in a suicide attempt after arguing with his wife about his alcohol use. Claimant reported going to school to the tenth grade and getting his GED. (Tr. 289). Dr. Hall listed in the diagnostic formulation major depression, recurrent, alcohol dependence, chronic back pain with bulging discs, moderate psychosocial and environmental stressors, and a 60 GAF. (Tr. 290). Dr. Hall continued his Neurontin and Cymbalta prescriptions. (Tr. 290).

Liam Mahoney, a physical therapist, completed a functional capacity evaluation on September 6, 2005. (Tr. 291). Mr. Mahoney found Claimant to be employable in the heavy work demand level, but he is limited with activities involving squatting/crouching, bending/stooping, and lifting from the floor level. (Tr. 292). Mr. Mahoney noted Claimant's primary limiting factors to be exaggerated pain reports, decreased tolerance to lifting from floor level, decreased squatting/crouching and bending/stooping, and deconditioned state. Mr. Mahoney opined that Claimant reported pain levels during the evaluation that did not correlate with his outward affect and demeanor. (Tr. 292). During examination, Mr. Mahoney observed he frequently expressed exaggerated pain, but Claimant's outward demeanor and affect did not match reported pain level. (Tr. 293). Moreover, Mr. Mahoney observed Claimant to ambulate with a left antalgic gait, occasionally exaggerated but then he used his LLE as his primary weight bearing base during lift testing. (Tr. 293). During testing, Claimant was able to lift and carry about thirty to sixty pounds. (Tr. 301-05).

In the Low Back Pain Disability Questionnaire, Claimant reported pain killers provide moderate relief from pain; he can only lift light weights; he cannot walk more than a mile; and he cannot stand for more than one hour or sit more than thirty minutes. (Tr. 307).

In the September 12, 2005 letter, Dr. Lange reviewed the functional capacity evaluation and opined that Claimant should be employable at a physical demand level at or below the heavy physical demand level. (Tr. 279). Dr. Lange noted he had not treated Claimant, and there must be consideration given to other findings of the functional capacity evaluation. (Tr. 279-80).

Claimant sought treatment in the emergency room on August 3, 2007 for left shoulder pain. (Tr. 313). Examination showed normal neck/back. (Tr. 316). The x-ray revealed a normal left shoulder. (Tr. 319).

On April 30, 2008, Claimant sought treatment in the emergency room left back pain. (Tr. 332, 601-05). The doctor prescribed muscle relaxers, Flexeril, and over-the-counter Ibuprofen as treatment. (Tr. 338).

On July 2, 2008, Claimant sought treatment in the emergency room for chronic back pain. (Tr. 606). The doctor prescribed Percocet as treatment. (Tr. 609).

On August 5, 2008, Claimant first received treatment at Taylor Medical Services for back pain and left leg numbness. (Tr. 347). Claimant missed his follow-up office visit on November 17, 2008. (Tr. 348).

On September 19, 2008, Claimant reported having depression and suicidal thoughts. (Tr. 610-11). The record notes Claimant has legal and financial problems stemming from child support payments. (Tr. 611). Ethanol intoxication is listed as an admitting diagnosis and a clinical

impression. (Tr. 610, 612). The doctor observed Claimant's gait and reflexes to be normal. (Tr. 612-13).

The Wellsville-Middleton R-1 school records show Claimant dropped out of school in tenth grade on October 12, 1983 after being in ninth grade for three years with the majority of his grades being Fs. (Tr. 27-28). Elementary school testing indicated full-scale IQs of 87 and 78. (Tr. 28). The school records show that Claimant was placed in special education classes during the 1976-77 school year. (Tr. 27-29, 177-79). In the February 15, 2010, Donna Haley, M.Ed., opined that Claimant was in special education classes in sixth grade but thereafter, the record does not show any other special education classes or services provided. (Tr. 340).

Claimant received $3,200 as a settlement of workers compensation benefits in April 2008. (Tr. 147-48).

Dr. Edward Martinson, a rehabilitation specialist, completed an evaluation of Claimant referred by Family Support Division on September 9, 2010. (Tr. 596-600). Examination showed tenderness reported to palpation of the lumbar paraspinals but no sciatic nerve and no bilateral trochanteric bursal tenderness. (Tr. 598). Dr. Martinson noted Claimant to have mild to moderate muscle spasm of the paraspinaic and upper gluteal with trigger points throughout the paraspinals left slightly more prominent than right. His trunk range of motion was at least moderately guarded with moderate-severe limitation of motion in all planes excluding flexion which was mild to moderately limited. (Tr. 598). Examination showed his motor strength to be 4-5/5. (Tr. 599). Dr. Martinson found that given Claimant's ongoing symptomatology, an MRI of his lumbar spine would allow for a more objective delineation of the anatomy of the lumbar spine for further evaluation/treatment decision making. (Tr. 599). Dr. Martinson opined that Claimant's conditions

would likely significantly limit him in regards to activities and options for ongoing gainful competitive employment which would entail maintaining a consistent erect posture, repetitive trunk movements, prolonged truck positions without allowance to change position as needed, prolonged standing/walking especially on uneven or dangerous slippery surfaces especially near dangerous or high speed equipment given his increased risk for falling in theses circumstances/situations, repetitive and/or heavy lifting/carrying, repetitive and/or rapid traversing of stairs, climbing ladders or walking in elevated unsecured places due to his risk for falling and the potential ramifications of falling in these conditions/situations, repetitive and/or prolonged kneeling/squatting/crawling with these conditions/limitations likely permanent and potentially slowly progressive if appropriate evaluation/treatment cannot be obtained/performed and given Mr. Kemp's apparent learning disability and limited education/work history consisting of manual labor type activities he is likely permanently disabled from ongoing gainful competitive employment within his education/training.

(Tr. 600).

The December 28, 2010 x-ray of his lumbar spine showed probable degenerative disc disease at L5-S1 level, and no other significant abnormalities. (Tr. 621).

On March 24, 2011, Dr. Garth Russell, an orthopaedic surgeon, interviewed and examined Claimant at the request of counsel. (Tr. 622-36). Claimant reported being unable to bend, lift, twist, or perform other activity. (Tr. 623). Dr. Russell observed Claimant to have a vaulting gait on his left side. Examination moderately severe muscle spasm in the erector spinae muscles and tenderness over the L4-5 and L5-S1 areas and mild weakness in doriflexion on the left side. (Tr. 623). Dr. Russell opined that his physical examination confirmed the presence of chronic nerve root pressure L5 nerve root. (Tr. 626). Dr. Russell concluded that Claimant "is unable to pursue gainful employment" inasmuch as he continues to show objective signs of nerve root pressure including muscle spasm, limitation of motion, and straight leg raising. (Tr. 627). Dr. Russell opined that he would be unable to sit more than one to two hours and to bend or lift even five pounds on a regular

basis. Dr. Russell found no restriction in his ability of his upper extremities. Dr. Russell found Claimant would have to lie down two to three times a day for rest. (Tr. 627).

The x-ray of his lumbar spine showed probable degenerative disc disease at L5-S1 level. (Tr. 389). The radiologist noted that in view of the patient's history of radiculopathy, he opined an additional evaluation with MRI of his lumbar spine may be useful. (Tr. 389).

On January 18, 2011, the Cooperative Disability Investigations Unit ("CDIU") for the Social Security Administration issued a Report of Investigation regarding Claimant. The author of the report, a DDS liaison, stated that on February 10, 2011, she and a detective initiated surveillance at Claimant's home address and observed Claimant walk to the end of his driveway without assistance and with a very slight limp to his left leg and then observed him holding a small plastic bucket and throwing on the driveway what appeared to be rock salt. (Tr. 551). Thereafter, they observed Claimant opening a car door and bend at the waist to start the ignition of the car. (Tr. 551). Thereafter, Claimant filled a car with gas and checked the tires air pressure. (Tr. 552).

During the deposition of January 10, 2012, Dr. Russell opined there was a mistake in the February 17, 2004 lumbar CT scan taken at Audrain Medical Center inasmuch as the impression described the L4 nerve roots but the impingement was at the L4-5 so therefore the impingement would have been on the L5 nerve root going down to the dorsum of the foot. (Tr. 375-77).

## IV. The ALJ's Decision

The ALJ found that Claimant met the insured status requirements on April 5, 2005, but he was no longer insured after December 31, 2006. (Tr. 402). Claimant has not engaged in substantial gainful activity since April 5, 2005. (Tr. 403). The ALJ found that the medical evidence establishes that Claimant has the severe impairment of degenerative disc disease, but no impairment or

- 17 -

combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 403-04). The ALJ opined that since April 15, 2005, Claimant has the residual functional capacity to perform light work except that he has a required a sit/stand option every thirty minutes, only able to stoop, crouch, kneel, crawl and climb stairs or ramps on an occasional basis, unable to climb ladders, ropes or scaffolds, unable to operate foot controls, and has to avoid concentrated exposure to extreme vibration, operational control of moving machinery, hazardous machinery, and unprotected heights. (Tr. 404). The ALJ found that Claimant is unable to perform any past relevant work. (Tr. 406).

The ALJ found Claimant was forty-years old on April 5, 2005 which is defined as a younger individual age 18-49 on the amended alleged disability onset date. (Tr. 406). The ALJ found Claimant has at least an eighth grade education. The ALJ found that there are jobs that exist in significant numbers in the national economy since April 5, 2005, that Claimant can perform work including a food and beverage clerk, cashier, or a mail room clerk. (Tr. 406-07). The ALJ concluded that Claimant has not been disabled. (Tr. 407).

## V. Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that

he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found

disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The claimant's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The claimant's subjective complaints relating to
       exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the
       March 7, 2013claimant's impairments.

6.     The testimony of vocational experts when required which
       is based upon a proper hypothetical question which sets forth the claimant's
       impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that he is presumptively disabled under Listing 1.04. Next, he contends that the ALJ's decision is not supported by substantial evidence inasmuch as the ALJ failed to evaluate the work-related limitations. Claimant contends the ALJ failed to fully and fairly develop the record regarding his mental impairment.

## A. Listing 1.04

Claimant argues that he is presumptively disabled under Listing 1.04.

Listing 1.04 is for "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root ... or the spinal cord." 20 C.F.R. Pt. 404, Subst. P, Apex. 1, § 1.04. The disorder must include (A) "[evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." Id. Claimant argues that he meets all of the criteria to be found disabled under this Listing. Claimant bears the burden of proving his impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). To meet a listing requirement, an impairment must meet all of the listing's specified criteria. Id. An impairment that only meets some criteria does not qualify, no matter how severe the impairment. Id.

In this case, the ALJ found that Claimant did not meet this listing requirement, because the medical record does not show the nerve root compression to be characterized by persistent motor loss. See 20 C.F.R. Part 404, Subpart P, App. 1, § 1.04. Claimant argues that his condition medically equals the listed requirement, and the ALJ's opinion did not adequately explain or support a finding to the contrary. Under 20 C.F.R. 404. 1526(a), an impairment is medically equivalent to a listed impairment if "it is at least equal in severity and duration to the criteria of any listed impairment." The fact that the ALJ did not elaborate on this conclusion is not a reversible error, as long as the conclusion is supported by the record. Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011)

("There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record.").

The ALJ's conclusion that Claimant's impairment does not meet or medically equal the requirements of § 1.04 is supported by the record. The record does not demonstrate the degree of impairment and restriction that would approach that contemplated by the listing. Dr. Lange reviewed his MRI and concluded that Claimant did not have disc herniation, and his symptoms of posterior leg discomfort really did not particularly agree with pathology at either level, and he had some positives from a Waddell's testing point of view. The presence of Waddell's signs indicates that he was exaggerating his symptoms. Indeed, Claimant's gait and reflexes were listed as normal during treatment in the emergency room. Dr. Lange's examination showed normal reflex and no obvious atrophy. During another examination, Dr. Martinson noted his motor strength to be 4-5/5. During physical therapy, Mr. Mahoney found Claimant to be employable in the heavy work demand level, being able to lift and carry about thirty to sixty pounds. Mr. Mahoney noted Claimant's primary limiting factors to be exaggerated pain reports, decreased tolerance to lifting from floor level, decreased squatting/crouching and bending/stooping, and deconditioned state. Mr. Mahoney opined that Claimant reported pain levels during the evaluation that did not correlate with his outward affect and demeanor. Moreover, Mr. Mahoney observed Claimant to ambulate with a left antalgic gait, occasionally exaggerated but then he used his LLE as his primary weight bearing base during lift testing. All of this evidence supports the ALJ's conclusion that Claimant did not meet or medically equal the criteria of Listing 1.04, and the ALJ's failure to discuss his reasoning in detail is not reversible error.

## B.  Medical Source Opinion Evidence

Claimant contends that the ALJ's decision is not supported by substantial evidence inasmuch as the ALJ failed to evaluate the work-related limitations imposed by Dr. Martinson and Dr. Russell.

The ALJ afforded slight weight to the medical opinion of Dr. Russell.  Indeed, the medical record shows his conclusions were inconsistent with the record as a whole and contrary to the radiological studies in the medical record, Claimant's course of treatment, and the functional capacity evaluation.[6]  In February 2005, Dr. Lange observed how Claimant "really presented in somewhat of a mixed fashion.  He did have some positives from a Waddell's testing point of view."  Dr. Lange concluded that his symptoms as presented would cause difficulty with heavy lifting and repetitive bending, but his symptoms would not prevent him from seeking employment at a lighter demand level although Claimant has not done so over the past two years.  In comparison, Claimant's single visit in March 2011, well after the end of the relevant period, the date of last insured,[7] Dr. Russell examined Claimant and observed a vaulting gait, difficulty walking on his heels, unable to bend or to

---

[6]Although Defendant is correct in noting that Dr. Russell's entire evaluation relationship was for the purposes of litigation at the request of counsel, not in the course of medical treatment, the undersigned finds there is nothing inherently suspect about that.  See Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998) (holding that the mere fact that a medical report is provided at the request of counsel does not provide a legitimate basis for rejecting it); Worzalla v. Barnhart, 311 F.Supp.2d 782, 797 (E.D.Wis. 2004) (stating that "it is counsel's job to marshal and present evidence supporting his or her client's claim," and that "a report cannot be rejected simply because the doctor preparing it was retained by claimant's lawyer"); Kent v. Sullivan, 1992 WL 80518, at *11 (N.D.Ill. Apr. 9, 1992) ("In short, without some better explanation of why a doctor's report on a disability claimant is not to be trusted, it is meaningless to say that the report was 'prepared in anticipation of continuing litigation.'").

[7]"Evidence of disability obtained after the expiration of insured status is generally of little probative value."  Strong v. Soc. Sec. Admin., 88 Fed. Apex. 841, 846 (6th Cir. 2004).  Medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the date of last insured.  See Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) (medical evidence after date last insured was only minimally probative of claimant's condition before date last insured, so did not affect disability determination).

lift even five pounds on a regular basis, and the need to rest two to three times a day by lying down. See, e.g., House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (noting how "Dr. McFarlin had been urging House to seek disability benefits since before June 2002, the ALJ had good reason to discount the new inconsistent opinions that House lacked the capacity to engage in sedentary occupations that require prolonged sitting. These opinions were rather obviously based upon Dr. McFarlin's understanding of the relevant disability criteria, not on medical evidence.").

Moreover, the record suggests that Dr. Russell relied on Claimant's self-reporting of his symptoms. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (holding the ALJ was entitled to give less weight to the opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence); Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data). As noted by the ALJ, Dr. Russell "did not take his own medical image of the claimant's lumbar spine." (Tr. 405).

The ALJ opined that "Dr. Martinson's opinions are given considerable evidentiary weight because they are consistent with the record as a whole." (Tr. 404). In Dr. Martinson's evaluation, examination showed tenderness reported to palpation of the lumbar paraspinals but no sciatic nerve and no bilateral trochanteric bursal tenderness; mild to moderate muscle spasm of the paraspinaic and upper gluteal with trigger points throughout the paraspinals left slightly more prominent than right; and trunk range of motion to be at least moderately guarded with moderate-severe limitation of motion in all planes excluding flexion which was mild to moderately limited. Further, Dr. Martinson's examination showed Claimant's motor strength to be 4-5/5. Dr. Martinson opined that Claimant's

impairments would significantly limit his ability to maintain a consistent erect posture, move his trunk repetitively, remain in prolonged positions without the ability to change, engage in prolonged standing/walking especially on uneven surfaces and unsafe positions, or perform repetitive and/or prolonged kneeling/squatting/crawling. A review of the ALJ's RFC shows he essentially adopted Dr. Martinson's work-related limitations. The ALJ included a sit/stand option in the RFC and found Claimant to be limited in stooping, crouching, kneeling, crawling, and climbing and had to avoid concentrated exposure to dangerous conditions like heights and moving machinery.

As noted by Claimant, Dr. Martinson further suggested that "given Mr. Kemp's apparent learning disability and limited education/work history consisting of manual labor type activities he is likely permanently disabled from ongoing gainful competitive employment within his education/training." A treating physician's opinion that a claimant is disabled or cannot be gainfully employed receives no deference inasmuch as it invades the province of the Commissioner to make the ultimate disability determination. See; House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination"); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (a treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."); see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) ("[S]tatements that a claimant could not be gainfully employed are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner."). Thus, the ALJ properly

disregarded the portion of Dr. Martinson's evaluation that opined Claimant is unable to perform gainful competitive employment.

As noted by the ALJ, the medical records during the April 2005 to September 2008 period, show Claimant received limited treatment and "demonstrated that the claimant had normal neurological results, except on one occasion when he exhibited a shuffling gait, and on another occasion when he vaguely exhibited diminished left lower extremity ability." In September 2008, a doctor observed upon examination Claimant's gait and reflexes to be normal. The record shows that Claimant sought out limited treatment and that all of his treatment had been conservative in nature. Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem."). Moreover, there is no evidence to indicate that he was ever denied treatment due to lack of funds, or that he ever availed himself of the treatment options available to indigent and/or low income individuals. Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992) (holding the claimant must present evidence of "severe financial hardship" such as a showing that the claimant attempted but failed to obtain low-cost medical treatment or the claimant had been denied medical care "because of ... [a] financial condition.").

The undersigned finds that the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir.

1996)).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

### C.  The ALJ's Duty to Develop the Record

Claimant contends the ALJ failed to fully and fairly develop the record regarding his mental impairment.  He argues that based on his school records and work history, the ALJ should have ordered a consultative examination to test his IQ.   For the first time, Claimant alleges that the ALJ erred by not sending him for a consultative mental examination.   Defendant asserts that the ALJ was not obligated to seek a consultative examination.  The undersigned agrees.

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  The ALJ does have a duty to develop the record; however the ALJ need only order a consultative examination where the evidence is not sufficient to support the decision or where additional evidence needed is not contained in the records of medical sources.  20 C.F.R. § 404.1519a(b)(1).  "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision."  Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (alteration in the original).

In Halverson v. Astrue, 600 F.3d 992, 933 (8th Cir. 2010), the Eighth Circuit rejected a claimant's argument that the ALJ had erred by not ordering a consultative mental examination, finding that the ALJ had properly based his adverse decision on the medical records, the claimant's statements, and "other evidence."  See also Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010) ("[T]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.") (internal quotations omitted).  Indeed at the hearing, Claimant testified that a lumbar impairment

prevents him from working. Claimant did not testify that he was limited in performing any daily functions as a result of his mental capacity. Where there is substantial evidence in the record to support the ALJ's decision, the ALJ does not err in failing to order a consultative examination. Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). The paucity of evidence regarding his alleged limited intellectual functioning or mental problems does not detract from this substantiality. See e.g. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitation "should not be held against the ALJ when there is medical evidence that supports the ALJ's decision.").

An ALJ's duty to develop the record arises only if a crucial issue was undeveloped. The record contains medical evidence from the relevant time period regarding Claimant's alleged disabilities. See Onstead v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993) (reversal due to failure to develop the record is warranted only where the failure is unfair or prejudicial). "'The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether a claimant is disabled.'" Halverson, 600 F.3d at 933 (quoting Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)). Other than Claimant completing only the eighth grade, failing certain grades, and not performing well in school, there is no evidence of a mental impairment.

The record is devoid of any evidence showing he left any jobs for any reason related to his intellectual functioning. See Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004) (claimant had never been terminated from a job for lack of mental ability; her work history showed she retained

the ability to perform simple jobs); Hines v. Astrue, 317 Fed.Appx. 576, 580 (8th Cir. 2009) (noting claimant had not been terminated from any past work due to lack of cognitive abilities).

Indeed, neither in his applications or his hearing testimony, does Claimant assert any borderline intellectual functioning prevent him from performing substantial gainful employment. Claimant did not allege any mental impairment as a disabling condition in his applications, in the Social Security Reports or at his hearing. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding substantial evidence in the record that plaintiff's depression did not result in significant functional limitations where plaintiff did not allege depression as the basis of her disability). Further, "an ALJ is not obligated 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (quoting Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996). In the instant case, there was sufficient medical evidence for the ALJ to determine that Claimant had not manifested mental retardation before the age of 22 and thus, the ALJ did not err by not having her IQ tested. See e.g. Clay v. Barnhart, 417 F.3d 922, 928-29 (8th Cir. 2005) (rejecting argument that Commissioner erred by not finding that claimant satisfied listing for mental retardation; claimant had not initially claimed mental retardation and only evidence to support onset before age 22 was "poor performance in, and early exit from school."). Hence, the ALJ did not fail in his duty to fully and fairly develop the record.

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time

for good cause is obtained, and that failure to file timely objections may result in a waiver of the right

to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  5th  day of February, 2014.